IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ANNA M. LIEBERS, | ) | |
| | ) | |
| Plaintiff, | ) | 4:03cv3322 |
| | ) | |
| vs. | ) | MEMORANDUM AND ORDER |
| | ) | |
| HAROLD W. CLARKE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on filing no. 64, the Motion for Summary Judgment filed by the defendants, Harold W. Clarke, et al.; and filing no. 94, the Opposition to Motion for Summary Judgment filed by the plaintiff, Anna M. Liebers.[1]  The plaintiff is a prisoner in the custody of the Nebraska Department of Correctional Services ("DCS") housed in the Nebraska Correctional Center for Women ("NCCW").

On May 25, 2003, a unit caseworker found an item of contraband in the nature of a weapon in mattress 40C in room 40 of NCCW, where the plaintiff and three roommates resided. Bunk 40C belonged to the plaintiff, but the applicable NCCW regulations presume that all occupants of a living unit have knowledge of contraband found in the unit unless an occupant rebuts the presumption with evidence to the contrary. The four occupants of room 40 were placed on immediate segregation. The plaintiff received a misconduct report (filing no. 12, Exh. 14; filing no. 65, Exh. 37) for the offense of possession or manufacture of weapons.

Because of the plaintiff's misconduct report and placement in immediate segregation, NCCW officials rescinded the plaintiff's visit with her children, previously scheduled for May 29, 2003. In addition, the plaintiff lost wages from her prison job[2] and had to leave a substance abuse class because of excessive absences resulting from her placement in segregation.

---

[1]Also before the court is filing no. 98, the plaintiff's Memorandum and Motion regarding the status of the parties' proposed Order on Final Pretrial Conference ("pretrial order"). The court has received the proposed pretrial order (filed as filing no. 99) and has noted the plaintiff's concerns. Because there has been no pretrial conference and the pretrial order has not been adopted by the court, I have not relied on filing no. 99 for any purpose in this Memorandum and Order. To the extent that filing no. 98 is a motion, the plaintiff's motion is granted.

[2]The plaintiff filed a state tort claim for her lost wages. (See filing no. 12 at ¶ 31.)

1

On June 5, 2003, defendant-Janice Axdahl served as the chairperson for the Institutional Disciplinary Committee ("IDC") hearing on the plaintiff's misconduct report. The plaintiff alleges various deprivations of procedural due process at the IDC hearing.

The plaintiff asserted as her defense that she had been set up. She pointed to her previous reports to corrections staff regarding conflicts with, and threats by, her three roommates in room 40. Also, the plaintiff had previously requested a room reassignment in light of improper activity in room 40 and her fear that she would be set up for a misconduct report, which would delay her consideration for parole. The plaintiff had spent considerable effort toward earning parole eligibility and had been doing well.

Axdahl found the plaintiff guilty and imposed 30 days of disciplinary segregation, with credit for the time (10 days) the plaintiff spent on immediate segregation, as well as two months loss of good time[3] and a recommendation for reclassification to administrative confinement (more segregation). (See filing no. 65, Exh. 18, transcript of IDC hearing, at 37.) The expressed reasons for the finding of guilt included: The weapon was found in the plaintiff's mattress. The weapon consisted of a white ink pen with a razor blade from a disposable safety razor attached to the end by green yarn wrapped around the pen. The plaintiff acknowledged use of pens, razors and yarn like those components of the weapon.

However, the plaintiff contends that the true reason Axdahl denied her procedural due process at the IDC hearing and found her guilty of misconduct was to retaliate for a grievance the plaintiff had recently filed against Axdahl. Thus, the plaintiff alleges a claim of retaliatory discipline against Axdahl.

The plaintiff's three roommates were found not guilty of misconduct, notwithstanding the presumption established by rules applicable to NCCW that all occupants of a living unit are deemed responsible for contraband found in the unit, absent evidence to rebut the presumption. Axdahl conducted the disciplinary hearings for two of the plaintiff's three roommates. (See filing no. 65, Exh. 2, Affidavit of Janice Axdahl, at ¶ 28.) The plaintiff, whose race differs from that of the three roommates, alleges a violation of equal protection in that she, a Caucasian, was found guilty but the IDC dismissed the charges against the

---

[3]In addition to the transcript of the IDC hearing, the IDC Action Sheet (filing no. 65, Exh. 19) indicates that the IDC imposed a penalty of two-months loss of good time as part of the plaintiff's discipline. However, someone crossed off the loss of good time from the Action Sheet and added the notation: "can't take good time on life sentence." The plaintiff is serving a prison term of 10 years to life, with an additional term of 6 to 8 years. The notation may have been added in recognition that, insofar as Neb. Rev. Stat. § 83-1,107 deducts good time from a maximum prison term to determine the date when discharge from state custody becomes mandatory, there is no mandatory discharge date for a life sentence. Thus, good time cannot shorten the maximum term of a life sentence, and forfeiture of good time cannot delay a mandatory discharge when, as in a life sentence, there is no mandatory discharge date.

three roommates, all African-Americans.

On appeal to the DCS Appeals Board, the plaintiff prevailed, and the Appeals Board reversed the decision of the IDC.  (See filing no. 1, Exh. 5; filing no. 12, Exh. 11; filing no. 65, Exh. 26.)  The Appeals Board found an absence of substantial evidence in the record to show that the plaintiff was responsible for the weapon.  While the Appeals Board did not expressly state that the plaintiff had been framed, the decision certainly gives rise to the inference that a set-up was an equally likely, if not more likely interpretation of the events than the IDC's view.

## Razors, Room Assignment, Polygraph

The plaintiff holds NCCW staff and management responsible for conditions which enabled the plaintiff's roommates to frame her.  First, according to the plaintiff, NCCW maintains a lax and indifferent policy regarding the risks associated with disposable razor blades.  Second, corrections staff refused to reassign the plaintiff to another room when she reported problems in room 40 before May 25, 2003 and requested a transfer.  In addition, the plaintiff protests that NCCW officials have refused to allow her to take a polygraph test or to have the weapon fingerprinted, even at her own cost, so that she may clear up any residual concerns the parole board may have about whether she had any involvement in the misconduct.  As to those three concerns, however, at least in the circumstances of this case, the United States Constitution does not afford the plaintiff any right or remedy.

As for the policy regarding razor blades, the plaintiff has not stated a claim on which relief may be granted under the Eighth Amendment to the Constitution.  To prevail on an Eighth Amendment failure-to-protect claim, the plaintiff must show that (1) she was incarcerated under conditions posing a substantial risk of serious harm and (2) the defendants subjectively knew of and disregarded an excessive risk to the plaintiff's safety. Smith v. Arkansas Dep't of Correction, 103 F.3d 637, 644 (8th Cir. 1996); Jensen v. Clarke, 73 F.3d 808, 810 (8th Cir. 1996).  The plaintiff has not made a sufficient showing regarding either element of that test.[4]  Negligence by a defendant does not suffice to establish deliberate indifference.  See, e.g., Pagels v. Morrison, 335 F.3d 736, 742 (8th Cir. 2003) ("negligence cannot give rise to an Eighth Amendment failure-to-protect claim").

As for the refusal to reassign the plaintiff to another room, again the plaintiff has failed to state a constitutional claim.  The Constitution does not require prisons to honor an inmate's requests regarding housing matters such as cell assignment or transfer.  The plaintiff has not stated a due process or Eighth Amendment claim regarding her housing assignment.  Similarly, regarding investigation of wrongdoing, the court finds no basis in

---

[4]Of course, the plaintiff has now placed the defendants on notice regarding the dangers of their razor policy in the event similar problems arise in the future with the plaintiff or other inmates.

3

the Constitution to require the State of Nebraska to use polygraphs and fingerprinting techniques in prison disciplinary investigations, even at an inmate's own expense.

### Retaliation

In certain circumstances, retaliation for the exercise of a constitutionally protected activity may give rise to a claim on which relief may be granted, even as to a convicted prisoner. However, no claim is stated when the alleged retaliation arises from an actual violation of prison regulations. Cowans v. Warren, 150 F.3d 910, 911 (8th Cir. 1998), *citing* Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990) (*per curiam*). See also Moore v. Plaster, 266 F.3d 928 (8th Cir. 2001), cert. denied, 535 U.S. 1037 (2002):

> We have long recognized an inmate's cause of action for retaliatory discipline under 42 U.S.C. § 1983 where a prison official files disciplinary charges in retaliation for the inmate's exercise of his constitutional rights .... However, claims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule .... **Thus, a defendant may successfully defend a retaliatory-discipline claim by showing "some evidence" that the inmate actually committed a rule violation.**

Id., 266 F.3d at 931 (emphasis added; citations omitted). Accord Goff v. Burton, 7 F.3d 734, 739 (8th Cir. 1993), cert. denied, 512 U.S. 1209 (1994). In this case, a violation of prison rules certainly occurred, and there was "some evidence" on which to hold the plaintiff responsible. Therefore, the plaintiff's retaliation claim must fail.

### Equal Protection

The evidence against the plaintiff at her IDC hearing was insubstantial, resulting in a reversal of the decision. The evidence against the plaintiff's roommates on the weapons charge was even less substantial. See generally Rahman X v. Morgan, 300 F.3d 970, 973 (8th Cir. 2002) (even if disciplinary infractions result in a difference in treatment among inmates, such "differential treatment will be upheld if there is any rational reason for it").

Furthermore, the record contains absolutely no evidence whatsoever that race constituted a factor in the disparate decisions at the IDC level. When reviewing the record in connection with a pending motion for summary judgment, the court may not weigh the evidence, determine credibility, or decide the truth of any factual matter in dispute. However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986). A party opposing summary judgment must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986) (emphasis in original). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." Id. The plaintiff has provided nothing more than speculation that

4

race played a part in the disciplinary decisions at issue in this case. Thus, there exists no genuine issue for trial on the plaintiff's equal protection claim.

## Due Process

For two reasons, the plaintiff cannot prevail on her due process claim. First, the outcome of this case is controlled by the Eighth Circuit's decisions in Ragan v. Lynch, 113 F.3d 875 (8th Cir. 1997), and Wycoff v. Nichols, 94 F.3d 1187 (8th Cir. 1996). Those cases indicate that the plaintiff received due process because any errors during the initial disciplinary proceedings were cured when the Appeals Board reversed the IDC's disciplinary decision upon review.

In Wycoff, the plaintiff, a prisoner, received 10 days in disciplinary segregation and a loss of 90 days of good time for violation of a prison rule. Id., 94 F.3d at 1188. On administrative appeal, his conviction was reversed, and his good-time credits were restored. Id. When he brought an action under 42 U.S.C. § 1983 for damages, alleging deprivations of due process, the district and appellate courts held that the administrative reversal of the disciplinary case and restoration of all good-time credits cured any due process violation that had occurred at the initial hearing. "[W]e find that the ISP's reversal of the case against Wycoff constituted part of the due process Wycoff received, and it cured the alleged due process violation based on the ISP disciplinary committee's initial decision to sanction Wycoff." Id., 94 F.3d at 1189.

Similarly, in Ragan, the inmate lost good-time credit in a disciplinary proceeding, but he later prevailed in a state court postconviction action, in which the court reversed the disciplinary conviction and restored the good-time credit. Id.,113 F.3d at 876. In the plaintiff's subsequent litigation pursuant to 42 U.S.C. § 1983 for damages, the district court granted summary judgment to the defendants. The Eighth Circuit affirmed, citing Wycoff to the effect that the plaintiff had suffered no injury, and that, even if he had, any harm had been remedied by the expungement of his disciplinary record and the return of his good-time credit.

> Regardless, Ragan has suffered no injury or, if he did, any harm suffered has already been remedied--his good-time credits have been returned and his disciplinary record expunged. **Because there was a procedure available to remedy the disciplinary committee's mistake, that error alone does not amount to a denial of due process**. Wycoff v. Nichols, 94 F.3d 1187, 1189 (8th Cir. 1996) (no due process violation in sanctioning inmate for conduct not prohibited by prison rules when appeal of discipline restored good-time credits because appeal procedure "constituted part of the due process [and] cured the alleged due process violation").

Id. at 876-77 (emphasis added).

5

Second, "[t]he Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake."  Wilkinson v. Austin, 125 S.Ct. 2384, 2393 (2005).  Thus, claims regarding the right to either procedural or substantive due process must begin with identification of a protected liberty or property interest.  Singleton v. Cecil, 176 F.3d 419, 424-25, 425 n. 7 (8th Cir.) (*en banc*), cert. denied, 120 S.Ct. 402 (1999).  A protected liberty interest may arise from either the Due Process Clause of the United States Constitution, itself, or from a state-created statutory entitlement.  Hewitt v. Helms, 459 U.S. 460, 466 (1983); Fraise v. Terhune, 283 F.3d 506, 522 (3d Cir. 2002) (citations omitted).

The Due Process Clause of its own force does not afford a prisoner a liberty interest in remaining in the general prison population.  Lekas v. Briley  405 F.3d 602, 607 (7th Cir. 2005).  See also Holly v. Woolfolk, 415 F.3d 678, 2005 WL 1661528 at *1 (7th Cir. 2005) ("being placed in segregation is too trivial an incremental deprivation of a convicted prisoner's liberty to trigger the duty of due process").  Accord Christianson v. Clarke, 932 F. Supp. 1178, 1182 (D. Neb. 1996) ("[T]he Due Process Clause itself does not protect any liberty interest in remaining free from administrative segregation or protective custody."). "[T]he notion of liberty inherent in the Fourteenth Amendment Due Process Clause is not implicated by" a placement or transfer which subjects a convicted prisoner to more severe conditions of confinement, without more.  Cf.  Meachum v. Fano, 427 U.S. at 225 ("That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.")

An inmate's claim to a state-created liberty interest is governed by the Supreme Court's decision in Sandin v. Conner, 515 U.S. 472 (1995).  "Sandin found no liberty interest protecting against a 30-day assignment to segregated confinement because [the assignment] did not 'present a dramatic departure from the basic conditions of [the inmate's] sentence.'"  Wilkinson v. Austin, 125 S.Ct. 2384, 2394 (2005), *quoting* Sandin, 515 U.S. at 485.

In Sandin, the Court substantially narrowed the circumstances in which a state-created liberty interest arises:

> The time has come to return to the due process principles we believe were correctly established and applied in Wolff and Meachum.  Following Wolff, we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause .... But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

6

Id. at 483-84 (citations omitted).   Therefore, to demonstrate a liberty interest created by state law, the plaintiff must show that the protested conditions exceed the normal range and limits of custody and impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Id.

In Nebraska, deprivation of good-time credit implicates a liberty interest sufficient to require due process.  Dailey v. Nebraska Dept. of Corr. Servs., 578 N.W.2d 869, 873 (1998).  See generally Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974) (when a state provides a right to good time and specifies the methods of forfeiture, an inmate has a constitutionally-protected liberty interest entitling him or her to procedures designed to ensure that the state-created right is not arbitrarily abrogated).  However, in this case, the plaintiff did not suffer any deprivation of good-time credit, possibly because her maximum term is a life sentence, but certainly because her disciplinary conviction was reversed.  Therefore, she suffered only the month or so in segregation, with the consequent loss of a visit with her children, loss of wages, and delayed completion of her substance abuse class.

As for the month or so in segregation, the Eighth Circuit has "consistently held that administrative and disciplinary segregation are not atypical and significant hardships under Sandin."  Portley-El v. Brill, 288 F.3d 1063, 1065 (8th Cir. 2002).  Accord Kennedy v. Blankenship, 100 F.3d 640, 642 n. 2, 643 (8th Cir.1996) (placement in punitive isolation was not an atypical and significant deprivation even though the prisoner faced restrictions in privileges regarding mail, telephone, visitation, commissary, and personal possessions).  See also Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003): "We have consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship."  The absence of contact visitation, exercise privileges, and chapel rights for 37 days did not constitute an atypical and significant hardship.  Id.  Thus, the plaintiff's loss of one visit with her children did not create a liberty interest where a liberty interest did not otherwise exist.

Regarding her loss of wages, a prisoner has no preexisting right to work in prison or to be paid for labor.  Indeed, prison officials may require inmates to work without any compensation at all.  See, e.g., Jennings v. Lombardi, 70 F.3d 994, 995 (8th Cir. 1995) ("[t]here is no constitutional right to prison wages and any such compensation is by the grace of the state"), citing Hrbek v. Farrier, 787 F.2d 414, 416 (8th Cir.1986).  Accord DeWalt v. Carter, 224 F.3d 607, 613 (7th Cir. 2000) (Prisoners have no constitutional right to a prison job or to wages for work performed while in prison.).  "Indeed, at common law an inmate not only did not have a property right in the product of his work in prison, but he also could be forced to forfeit all rights to personal property."  Givens v. Alabama Department of Corrections, 381 F.3d 1064, 1068 (11th Cir. 2004).

The Nebraska Legislature has determined, however, that inmates in state institutions shall be employed so as "[t]o establish good habits of work and responsibility, to foster vocational training, and to reduce the cost of operating the facilities.  Neb. Rev. Stat. § 83-183(1).  Furthermore, such inmates shall be paid wages.  The Director of DCS

7

"shall make rules and regulations governing the hours, conditions of labor, and the rates of compensation" for inmates committed to DCS custody. Id. § 83-183(2). Nevertheless, the plaintiff's loss of wages by virtue of an otherwise lawful placement in segregation does not create rights under the Due Process Clause, as a prisoner has no property interest or constitutional right in any particular prison employment. Mitchell v. Kirk, 20 F.3d 936, 938 (8th Cir. 1994); Hamm v. Moore, 984 F.2d 890, 893 (8th Cir. 1992); Flittie v. Solem, 827 F.2d 276, 279 (8th Cir. 1987) (*per curiam*).

Finally, the delay in completion of the plaintiff's substance abuse class did not create an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. at 484. In short, the plaintiff's period in segregation was relatively short. The conditions there were not "outside the ordinary realm of what is to be expected of prison life."[5] The plaintiff had no liberty or property interest arising under the Due Process Clause itself or state law, and, therefore, she did not suffer a deprivation of liberty or property entitling her to the specific procedural safeguards which are the subject of her complaint.

THEREFORE, IT IS ORDERED:

1. That filing no. 64, the defendants' Motion for Summary Judgment, is granted;

2. That filing no. 94, the plaintiff's Opposition to Motion for Summary Judgment, is denied;

3. That filing no. 98, the plaintiff's Motion concerning the pretrial order, is granted;

4. That all other pending motions are denied as moot; and

5. That a separate judgment will be entered accordingly.

DATED this 26th day of September, 2005.

BY THE COURT:

s/ Joseph F. Bataillon
JOSEPH F. BATAILLON
Chief District Judge

---

[5] Christianson v. Clarke, 932 F. Supp. 1178, 1182 (D. Neb. 1996), *citing* Sandin.